Exhibit 17

# Exhibit 17

DOCKET NUMBER: FST-CV-08-5008432-S

| | | |
|---|---|---|
| US BANK NATIONAL ASSOCIATION AS TRUSTEE | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT OF |
| Plaintiff, | : | STAMFORD-NORWALK |
| | : | |
| – against – | : | AT STAMFORD |
| | : | |
| ELIZABETH P. CONRAD, ET AL., | : | July 20, 2012 |
| | : | |
| Defendant. | : | |

**Objection to Motion for Judgment of Strict Foreclosure**

Defendant, Elizabeth P. Conrad ("Conrad"), hereby objects to plaintiff's April 13, 2010 motion for judgment of strict foreclosure (Document No. 132).

**Statement of Facts**

The complaint alleges that, "[o]n or about July 21, 2006, the Defendant(s), Elizabeth P. Conrad, executed and delivered to Mortgage Lenders Network USA, Inc., a Note (the 'Note') for a loan in the original principal amount of $460,000.00" (Complaint ¶ 3). The complaint also alleges that, "to secure said Note," Conrad and her brother, John W. Conrad, mortgaged their home at 58 Weed Hill Avenue, Stamford, Connecticut to "Mortgage Electronic Registration Systems, Inc. as Nominee for Mortgage Lenders Network USA, Inc." (Complaint ¶ 4).

Plaintiff claims to be the "holder of said Note and Mortgage" (Complaint ¶¶ 4 & 5) and that "said Note is in default" (Complaint ¶ 5).

On January 8, 2009, the clerk granted plaintiff's motion to default Conrad for failure to plead (Document No. 107).

Upon information and belief, on or about December 12, 2009, plaintiff filed with the Court a "Statement" (Document No. 115) that included a copy of what plaintiff claimed is the Note, a copy of which is attached hereto. The copy of the Note purports to include an allonge containing two endorsements. The first endorsement purports to be from "EMAX FINANCIAL GROUP, LLC" to "RESIDENTIAL FUNDING COMPANY, LLC" and is purportedly signed by "Residential Funding Corporation as Attorney in Fact for; EMAX FINANCIAL GROUP, LLC." The second endorsement purports to be from "Residential Funding Company, LLC" to "U.S. Bank National Association as Trustee."

On October 6, 2010, plaintiff filed an affidavit of debt dated April 6, 2010 in which the affiant, Xee Moua, claimed to be "an authorized signer as a Vice President of Loan Documentation on behalf of Americas Servicing Company for Norwest Home Improvement, the authorized loan servicing agent on behalf of the Plaintiff in this action." (Document No. 140 at ¶2).

On May 9, 2012 (Document No. 149), May 24, 2012 (Document No. 152) and July 18, 2012 (Document No. 154), plaintiff filed identical affidavits of debt dated February 3, 2012 in which the affiant, Jan Whisnant, claimed to be "an Assistant Secretary of Residential Funding Company, LLC the servicer for the Plaintiff and Vice President of Loan Documentation of Wells Fargo Bank, N.A., the sub servicer for the Plaintiff" (E.g. Document No. 154 at ¶ 1). Whisnant claims that "the Plaintiff is the

party entitled to collect the debt evidenced by said note and is the party entitled to enforce the mortgage securing it" (E.g. Document No. 154 at ¶ 1b).

**Argument**

I.     **No Judgment of Foreclosure Can Enter Because Plaintiff did not Plead a Foreclosure Claim**

     **A.     Judgment Can Be Rendered Only on a Cause of Action Alleged in the Complaint**

The motion for judgment is based on the default for failure to plead. "[T]he effect of a default is to preclude the defendant from making any further defense in the case so far as liability is concerned ...." Practice Book § 17-33(b); *Bonner v. American Financial Marketing Corporation*, 181 Conn. 57, 58 (1980) ("[t]he effect of the entry of the default was to preclude the defendant from making any defense to liability in the action"). More specifically, "'[t]he entry of a default constitutes an admission by the [defaulted party] of the truth of the facts alleged in the complaint.'" *TD BankNorth, N.A. v. White Water Mountain Resorts of Connecticut, Inc.*, 133 Conn.App. 536, 545 (2011) (quoting *Motherway v. Geary*, 82 Conn.App. 722, 728 (2004)). "Judgment may be rendered for the relief demanded on any right of action which the facts alleged in the complaint are sufficient in law to support." *Benoit v. Amalgamated Local 299 United Electrical Radio and Machine Workers of America*, 150 Conn. 266, 277 (1963) (citing *Makusevich v. Gotta*, 107 Conn. 207, 209; *Cole v. Jerman*, 77 Conn. 374, 383). "Furthermore, the judgment must follow the proof of the facts alleged, whatever view the court may take of the classification of the cause of action." *Benoit*, 150 Conn. at 277 (citing *Metropolis Mfg. Co. v.*

*Lynch*, 68 Conn. 459, 470).  Therefore, a judgment can be rendered only on a cause of action alleged in the complaint.

### B.    Ownership Allegation is an Element of a Prima Facie Foreclosure Claim

Our Supreme Court has observed that "[a] note and a mortgage given to secure it are separate instruments, executed for different purposes and in this State action for foreclosure of the mortgage and upon the note are regarded and treated, in practice, as separate and distinct causes of action."  *New England Savings Bank v. Bedford Realty Corp.*, 238 Conn. 745, 759 (1996); *Hartford National Bank & Trust Co. v. Kotkin*, 185 Conn. 579, 581 (1981) (same).

Our Supreme Court also has observed, that because the causes of action are distinct, they have different standing requirements. "[S]tanding to enforce the promissory note is provided by the Uniform Commercial Code, pursuant to which only a holder of an instrument, or someone who has the rights of a holder, is a '[p]erson entitled to enforce' an instrument."  *RMS Residential Properties v. Miller*, 303 Conn. 224, 230-31 (2011) (citing CGS § 42a-3-301).  "[H]owever," the Court went on to note, "the holder of the note's power to enforce is merely at law (i.e., the right to enforce personal liability), and ... a note holder must demonstrate ownership of the underlying debt to exercise the equitable power of foreclosure."  *RMS*, 303 Conn. at 231.  In other words, the "mere holder of [a] promissory note, if not [the] owner of [the] underlying debt, cannot exercise [the] equitable power of foreclosure[.]"  *Id.* (describing *New England Savings Bank v. Bedford Realty Corp.*, 238 Conn. 745, 759-60 (1996)).

Given our Supreme Court's observations, there can be no credible dispute that only the owner of the debt has the right to foreclose the mortgage.  Indeed, as our Appellate Court repeatedly has

observed, "[t]o make out its prima facie case, [the foreclosing party] ha[s] to prove by a preponderance of the evidence that it [is] the owner of the [debt] ...." *Franklin Credit Management Corp. v. Nicholas*, 73 Conn.App. 830, 838 (2002), *cert. denied*, 262 Conn. 937 (2003); *Webster Bank v. Flanagan*, 51 Conn.App. 733, 750-51 (1999) (same); *Ocwen Federal Bank v. Charles*, 95 Conn. App. 315, 320 n.5 (2006), *cert. denied*, 279 Conn. 909 (2006) (same).  Thus, ownership of the debt is one of the facts constituting a foreclosure cause of action.  "A plaintiff must plead facts forming a prima facie claim." *Fulcher v. Mazzella*, CV 03 0090452S, (Litchfield Nov. 7, 2003) ([citing Stevenson's Connecticut Civil Procedure, Third Edition §83c]) (copy attached). As such, ownership of the debt is a fact that a foreclosure plaintiff must allege in the foreclosure complaint.  CGS § 52-91 (the complaint "shall contain a concise statement of the facts constituting the cause of action"); Practice Book § 10-20 (same); Practice Book § 10-1 ("[e]ach pleading shall contain a plain and concise statement of the material facts");  *see J.P. Morgan Chase Bank v. Gilmore*, FST-CV-04-4001641-S (Oct. 25, 2006) (foreclosure plaintiff must plead and prove the elements of a prima facie case including ownership of the debt) (copy attached).  Indeed, "[i]t is incumbent on a plaintiff to allege some recognizable cause of action in his complaint." *Larobina v. McDonald*, 274 Conn. 394, 402 (internal quotes omitted).  "The burden of alleging a recognizable cause of action rests upon the plaintiff." *DeMello v. Plainville*, 170 Conn. 675, 677 (1976).

### C.    Plaintiff Does Not Allege Ownership by Alleging "Holder" Status

As noted, plaintiff alleged that it was the "holder" of the note and mortgage (Complaint ¶¶ 4 & 5). Under the UCC, "'holder' means ... [t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession ...." CGS § 42a-1-201(21)(A). The "holder" of a note has the right to enforce the note even if it does not own the note. CGS § 42a-3-301 ("[a] person may be a person entitled to enforce the [note] even though the person is not the owner of the [note]"). In other words, the UCC separates ownership of the note from the right to enforce the note. As the Official Comments to the UCC explain, "[t]he right to enforce an instrument and ownership of the instrument are two different concepts. A thief who steals a check payable to bearer becomes the holder of the check and a person entitled to enforce it, but does not become the owner of the check." CGS § 42a-3-203, Official Comment 1(copy attached). "Ownership rights in instruments [are] determined by principles of the law of property, independent of Article 3 [of the UCC]." *Id.* Thus, the allegation that plaintiff is the "holder" does not equate to an allegation of ownership.

### D.    *RMS* Presumption is Not Available Absent Ownership Allegation

As the Supreme Court observed in *RMS*, holder status is relevant, but only to the extent it gives rise to a rebuttable presumption of *ownership*. *RMS*, 303 Conn. at 231-32. The presumption, however, is not available to a plaintiff who did not allege ownership. "A rebuttable presumption is equivalent to prima facie proof of a fact ...." *Fish v. Fish*, 285 Conn. 24, 46 n. 21, 939 A.2d 1040 (2008). Presumptions are substitutes for evidence that have "no probative force." *O'Dea v. Amodio*, 118 Conn.

58, 60 (1934); *Vincent v. Mutual Reserve Fund Life Association*, 77 Conn. 281, 288 (1904). They merely relieve the party with the burden of proof from "the duty of going forward in argument or evidence" and cast that duty upon the party against whom the presumption operates. *Vincent*, 77 Conn. at 288; *O'Dea*, 118 Conn. at 60-61. As noted, in a foreclosure action, "a note holder must demonstrate ownership of the underlying debt to exercise the equitable power of foreclosure." *RMS*, 303 Conn. at 231. The rebuttable presumption relieves a proven holder from going forward with evidence of ownership: "'The production of the note establishes his case prima facie against the makers and he may rest there.... It [is] for the defendant to set up and prove the facts which limit or change the plaintiff's rights.'" *Id.* at 232 (quoting *Garris v. Calechman*, 118 Conn. 112, 115 (1934).)

As an evidentiary substitute, a plaintiff may rely on a presumption only as prima facie proof of an alleged fact necessary to its cause of action. "[T]he use of a legal presumption [is] to establish prima facie the truth of an essential allegation in the pleadings." *Vincent*, 77 Conn. at 288. Indeed, "[t]he principle that a plaintiff may rely only upon what he has alleged is basic." *Matthews v. F.M.C. Corporation*, 190 Conn. 700, 705 (1983); *Kelley v. Bonney*, 221 Conn. 549, 590 (1992) (same); *Rosick v. Equipment Maintenance and Service, Inc.*, 33 Conn.App. 25, 31 (1993) (same).

Because ownership is an essential element of a foreclosure case, and a plaintiff may rely only on what he has alleged, a foreclosing plaintiff cannot rely on the rebuttable presumption of ownership unless it has alleged ownership of the debt. In other words, the presumption cannot arise unless the plaintiff claims to be the owner of the note, and not merely its holder.

*         *         *

In sum, a judgment may enter only a claim alleged in the complaint. A foreclosure claim requires the plaintiff to plead that it owned the underlying debt and the *RMS* presumption can be available only to a plaintiff that alleged ownership. Because plaintiff failed to plead that it owns the debt, it did not state a claim for foreclosure of the mortgage. No judgment of foreclosure may enter.

If plaintiff has alleged any cause of action, it would be a claim for personal liability on the note. Clearly, no judgment of foreclosure can enter on claim for personal liability on a note.[1]

## II.    Plaintiff is Not the Holder of the Note

There are two problems with plaintiff's claim that it is the holder of the Note. First, the Note was originally payable to "Mortgage Lenders Network USA, Inc." Neither the Note itself nor the putative allonge includes any endorsement, in blank or otherwise, by "Mortgage Lenders Network USA, Inc." As noted, the "holder" of a note has only the right to enforce the note. CGS § 42a-3-301. A person can become a "holder" only through "negotiation" of the note. CGS § 42a-3-201(a). "[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument *and its endorsement by the holder*." CGS § 42a-3-201(b) (emphasis added). "Mortgage Lenders Network USA, Inc." was the first "holder" of the Note. Residential Funding Company, LLC never became the holder of the Note because "Mortgage Lenders Network USA, Inc." never endorsed the Note. Plaintiff never became the holder of the Note because Residential Funding Company, LLC never became the holder and thus had no ability to negotiate the Note to plaintiff.

---

[1]In this regard, plaintiff cannot rely on Practice Book §§ 17-33 or 23-18 to prove the debt because this is not a foreclosure action.

Second, as noted, Residential Funding Company, LLC purported to use its alleged status as attorney-in-fact for another to endorse the Note to itself. In other words, Residential Funding Company, LLC engaged in self-dealing, which vitiated the agency relationship. "When an agent, by his self-serving conduct, so abandons his principal's interests as to act adversely to those interests, or worse, to act in fraud of his principal, it can fairly be said "'that, pro tanto, the agency really cease[s].'" *Reider v. Arthur Andersen, LLP*, 47 Conn.Supp. 202, 210, 784 A.2d 464 (2001) (quoting *Resnik v. Morganstern*, 100 Conn. 38, 43 (1923) ["if [the agent] acted adversely to the [principal's] interest ... through some interest or motive of his own, or that of another ... pro tanto the agency really ceased"]).

### III. Even if the *RMS* Presumption is Available Based on a Holder Allegation, Plaintiff Must Establish that it was the Holder on the Date the Action Commenced to Establish Standing to Foreclose

#### A. The Standing Requirement

"'Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action.'" *Fink v. Golenbock*, 238 Conn. 183, 199, 680 A.2d 1243, 1253 (1996) (quoting *Ardmare Construction Co. v. Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983)). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 485, 815 A.2d 1188, 1193 (2003). This principal is applicable in foreclosure actions. *Park National Bank v. 3333 Main, LLC*, 127 Conn.App. 774, 779, 15 A.3d 1150 (2011) (mortgage foreclosure action in which the court observed that "[w]here a party is found to lack standing, the court is consequently without subject matter jurisdiction to determine the

cause''); *Equity One, Inc. v. Shivers*, 125 Conn.App. 201, 205, 9 A.3d 379 (2010) (mortgage foreclosure action in which the court observed that "a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim"); *Chiulli v. Zola*, 97 Conn.App. 699, 704, 905 A.2d 1236 (2006) (mechanic's lien foreclosure action in which the court observed "[i]t is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction"); *Fleet National Bank v. Nazareth*, 75 Conn.App. 791, 793, 818 A.2d 69 (2003) (mortgage foreclosure action in which the court observed that "a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim"); *Dime Savings Bank of Wallingford v. Arpaia*, 55 Conn.App. 180, 183; 738 A.2d 715 (1999) (mortgage foreclosure action in which the court observed "[w]here a plaintiff lacks standing to sue, the court is without subject matter jurisdiction").

Once the issue of lack of subject matter jurisdiction has been raised, the court is compelled to resolve it before proceeding further with the case. As our Supreme Court often has observed:

> Whenever a lack of jurisdiction appears on the record, the court must consider the question. *Groton v. Commission on Human Rights & Opportunities*, 169 Conn. 89, 101, 362 A.2d 1359. The court must address itself to that issue and fully resolve it before proceeding further with the case. *Kohn Display & Woodworking Co. v. Paragon Paint & Varnish Corporation*, 166 Conn. 446, 448, 352 A.2d 301; *Wawrzynowicz v. Wawrzynowicz*, 164 Conn. 200, 203, 319 A.2d 407.

*Valley Cable Vision, Inc. v. Public Utilities Commission*, 175 Conn. 30, 32, 392 A.2d 485, 486 (1978).

### B.     Standing is Determined as of the Date the Action Commenced

Standing is determined as of the date the action is commenced.  *Park National Bank*, 127 Conn.App. at 779 ("when the jurisdiction of the court hinges on a factual determination regarding the

plaintiff's status ... at the time of the commencement of the action, the court must determine the pertinent facts necessary to ascertain whether jurisdiction existed and rule on the issue of standing before addressing the merits of the controversy"); *Shivers*, 125 Conn.App. at 206 ("we remand the case for an evidentiary hearing to ascertain the plaintiff's status at the time it commenced the action so that the trial court can properly determine whether it has subject matter jurisdiction"); *see also  See HSBC Bank USA, N.A v. Navin*, 129 Conn.App. 707, 711-12*; Deutsche Bank National Trust Co. v. Bialobrzeski*, 123 Conn.App. 791, 799–800, 3 A.3d 183 (2010); *LaSalle Bank, National Assn. v. Bialobrzeski*, 123 Conn.App. 781, 789–90, 3 A.3d 176 (2010).

### C.    Plaintiff has the Burden of Proving Standing

"Because standing implicates the court's subject matter jurisdiction, the plaintiff ultimately bears the burden of establishing standing." *Seymour v. Region One Board of Education*, 274 Conn. 92, 104, 874 A.2d 742, 749 (2005); *Park National Bank, supra*, 127 Conn.App. at 779 ("[t]he burden of demonstrating that a party has standing to bring an action is on the plaintiff"). If the *RMS* presumption is available to plaintiff, plaintiff has the burden of proving the facts that give rise to the presumption – i.e., that it was the holder of the note on the date it commenced the action.

### D.    Standing Cannot be Conferred by Waiver or Consent

As noted, the Supreme Court in *RMS* observed that only the owner of the debt has the right to foreclose and the holder of the note is entitled to a rebuttable presumption of ownership. *RMS*, 303 Conn. at 230-32.  As shown in this Section II, a plaintiff intending to rely on the presumption must prove that it was the holder of the note on the date the action commenced.  Plaintiff has not proffered any

evidence in this regard.  The default entered against the Shacks is not a substitute for evidence because standing cannot be conferred by waiver or consent.

"It is axiomatic ... that [t]he subject matter jurisdiction requirement may not be waived by any party...." *Mullin v. Guidant Corp.*, 114 Conn.App. 279, 284, 970 A.2d 733 (2009) (internal quotes and cites omitted).  Indeed, our Supreme Court often has observed that "[t]he subject matter jurisdiction requirement may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." *Ajadi v. Commissioner of Correction*, 280 Conn. 514, 532-33, 911 A.2d 712 (2006);  *Peters v. Department of Social Services*, 273 Conn. 434, 441, 870 A.2d 448 (2005) (same); *Lewis v. Connecticut Gaming Policy Bd.*, 224 Conn. 693, 698-99, 620 A.2d 780 (1993) (same); *Laurel Park, Inc. v. Pac*, 194 Conn. 677, 677 n. 1, 485 A.2d 1272 (1984) (same).

Consequently, Practice Book § 10-33 provides, as follows: "Any claim of lack of jurisdiction over the subject matter cannot be waived; and whenever it is found after suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the judicial authority shall dismiss the action."

It is equally clear that "[s]ubject matter jurisdiction, unlike jurisdiction of the person, cannot be created through consent ...." *Castro v. Viera*, 207 Conn. 420, 429-30, 541 A.2d 1216 (1988) (citing *United States Trust Co. v. Bohart*, 197 Conn. 34, 39, 495 A.2d 1034 (1985); *Hayes v. Beresford*, 184 Conn. 558, 562, 440 A.2d 224 (1981); *State v. Jones*, 166 Conn. 620, 627, 353 A.2d 764 (1974); *Reed v. Reincke*, 155 Conn. 591, 598, 236 A.2d 909 (1967)).

As noted, a default for failure to plead operates as admission of the facts alleged and precludes the defaulted party from disputing liability.  Said another way, default for failure to plead in response to a complaint is essentially a waiver of the right to contest the factual allegations of the complaint. *Abbott Terrace Health Center, Inc. v. Parawich*, 120 Conn.App. 78, 85 (2010); *Richey v. Main Street Stafford, LLC*, 110 Conn.App. 209, 218 (2008).  But, as noted, standing cannot be created by waiver or consent.  Thus, standing cannot be created by waiver of the right to contest a factual allegation.  Standing either exists or does not exist.  For this reason, the Appellate Court has observed that, irrespective of whether the borrower was defaulted, the trial court must "specifically" find that the foreclosing party had standing at the time it commenced the action before the court can enter a foreclosure judgment.  In *Shivers, supra*, the Appellate Court noted that the borrower had been defaulted for failure to plead.  *Id.*, 125 Conn.App. at 203.  The borrower raised the plaintiff's lack of standing as an objection to plaintiff's motion to open the judgment and extend the sale date.  *Id.* at 205.  The Appellate Court observed as follows with respect to the hearing on plaintiff's motion to open:

> [T]he court primarily addressed issues relative to the reentering of the judgment of foreclosure, namely, the amount of debt and the setting of the law days. The court also concluded that the plaintiff had standing. This conclusion, however, was based on a brief colloquy between the court and the plaintiff's counsel in which the plaintiff's counsel presented an original copy of the note to the defendant and stated that he believed that the note was provided to the court at the time of the original judgment. The court did not find specifically that the plaintiff was the holder of the note at the time that it instituted the action. Because jurisdiction in this case hinges on a factual determination regarding the plaintiff's status as holder of the note when it instituted this action, we conclude that the court improperly failed to determine the pertinent facts necessary to ascertain whether jurisdiction existed. Accordingly, we remand the case for an evidentiary hearing to ascertain the plaintiff's status at the time it commenced the action so that the trial court can properly determine whether it has subject matter jurisdiction.

*Shivers*, 125 Conn.App. at 206.  201.

In other words, default for failure to plead and presentation of the original note containing proper endorsements at the time of judgment are insufficient as a matter of law to determine a foreclosing party's status at the commencement of the action.  There must be evidence.  *See Navin, supra*, 129 Conn.App. at 711-12 (declining to dismiss for lack of standing where plaintiff submitted an uncontradicted affidavit averring that it was the holder before the action commenced).

**E.**    **Evidentiary Hearing and Pre-Hearing Discovery would be Required to Determine Plaintiff's Status at the Commencement of the Action**

If the presumption is available to plaintiff, despite the absence of proper endorsements and of any evidence bearing on plaintiff's status at the time it commenced the action, there is an unresolved factual issue as to whether plaintiff was the holder of the note on the date it commenced the action. The factual issue can be resolved only through an evidentiary hearing. *Standard Tallow Corp. v. Jowdy*, 190 Conn. 48, 56, 459 A.2d 503 (1983) ("[w]hen issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses"); *Park National Bank*, 127 Conn.App. at 779 ("when the jurisdiction of the court hinges on a factual determination regarding the plaintiff's status ... at the time of the commencement of the action, the court must determine the pertinent facts necessary to ascertain whether jurisdiction existed and rule on the issue of standing before addressing the merits of the controversy").  Indeed, the Appellate Court has observed that it is reversible error for Superior Court to determine standing in a foreclosure action without conducting an evidentiary hearing. *Shivers*,

125 Conn.App. at 206 ("we remand the case for an evidentiary hearing to ascertain the plaintiff's status at the time it commenced the action so that the trial court can properly determine whether it has subject matter jurisdiction"); *Park National Bank*, 127 Conn.App. at 780; *Deutsche Bank National Trust Co. v. Bialobrzeski*, 123 Conn.App. at 799–800; *LaSalle Bank, National Assn. v. Bialobrzeski*, 123 Conn.App. at 789–90. In this regard, the Appellate Court in *Shivers* remanded the case for an evidentiary hearing even though the borrower did not present any evidence bearing on plaintiff's status at commencement of the action. *Shivers*, 125 Conn. at 205-06.

In addition to the issue of whether plaintiff was a holder at commencement, there may be an issue as to whether plaintiff owned the debt at the commencement of the action. "A [rebuttable] presumption requires that a particular fact be deemed true until such time as the proponent of the invalidity of the fact has, by the particular quantum of proof required by the case, shown by sufficient contradictory evidence, that the presumption has been rebutted." *Fish*, 285 Conn. at 46 n. 21. In noting that the holder receives a rebuttable presumption, the Supreme Court in *RMS* did not address "the particular quantum of proof" necessary to rebut the presumption of ownership on a motion to dismiss a foreclosure action for lack of standing. For guidance on that issue, we turn to other Supreme Court precedent. "Presumptions which have their basis merely in convenience and serve to bring out the real issues in dispute, thus avoiding the necessity of producing evidence as to matters not really in issue, ... operate only until the defendant has produced some substantial countervailing evidence, some evidence sufficient to raise an issue, and when that has been done they drop out of the case." *O'Dea*, 118 Conn. at 61; *Vincent*, 77 Conn. at 290. The rebuttable presumption in a foreclosure case serves to ferret out whether there is a genuine issue as

to ownership. As such, the borrower rebuts the presumption by creating a genuine issue of fact as to ownership.

Under *RMS*, any evidentiary hearing will involve the issues of whether plaintiff was the holder of the note and owner of the debt at the time it commenced the action. Because Conrad plainly was not involved in any transfer of possession of the note, or of ownership of the debt, she is entitled to discovery from plaintiff, i.e. the party who claimed to be the holder. To conclude otherwise effectively would be to deprive Conrad of the right the Supreme Court observed she has: to challenge plaintiff's status at the commencement of the action. *Id.*

### Conclusion

For the foregoing reasons, the Court should deny plaintiff's motion for judgment of strict foreclosure. In the alternative, the Court should dismiss the action for lack of standing or conduct an evidentiary hearing, and permit the Shacks to take pre-hearing discovery as to plaintiff's status at the time it commenced the action.

DEFENDANT,
ELIZABETH P. CONRAD

By:   407598
            Christopher G. Brown
BEGOS HORGAN & BROWN LLP
2425 Post Road, Suite 205
Southport, CT 06890
(203) 254-1902

## Certification

I hereby certify that on July 20, 2012 a copy of the foregoing was mailed to all counsel and pro se parties of record, as follows:

| | | |
|---|---|---|
| HUNT LEIBERT JACOBSON PC<br>50 WESTON STREET<br>HARTFORD, CT 06120 | DAVID J MARANTZ<br>60 LONG RIDGE ROAD<br>SUITE 200<br>STAMFORD, CT 06902 | COHEN & ACAMPORA<br>8 FRONTAGE ROAD<br>EAST HAVEN, CT<br>06512 |
| ELIZABETH P. CONRAD<br>58 WEED HILL AVE<br>STAMFORD, CT 06907 | JOHN W. CONRAD<br>58 WEED HILL AVE.<br>STAMFORD, CT 06907 | US ATTORNEY<br>DISTRICT OF CONN<br>157 CHURCH ST 23RD FL<br>NEW HAVEN, CT 06510 |

407598
Christopher G. Brown

510000989

ADJUSTABLE RATE BALLOON NOTE
30-YEAR TERM / 40-YEAR AMORTIZATION
(Assumable during Life of Loan)

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

July 21, 2006                    STAMFORD                         Connecticut
[Date]                            [City]                              [State]

58 WEED HILL AVENUE  , STAMFORD, CT 06907
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    460,000.00  (this is called "Principal"), plus interest, to the order of the Lender.  The Lender is MORTGAGE LENDERS NETWORK USA, INC.  .  I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of  8.7000   %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

40/30 MULTISTATE ADJUSTABLE BALLOON NOTE (ADJUSTABLE RATE)  (Assumable)

4030N1MU 4/06                    Page 1 of 4                      Initials: BPC

115.00

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **September 1, 2006**. I will make these payments every month until I have paid all of the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2036**                      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **10 RESEARCH PARKWAY, WALLINGFORD, CT   06492**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $  **3,442.40**                  . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of **August 1, 2008**       , and may change on that day every **6th**      month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market , as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Two-Tenths** percentage points ( **6.20000**           %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on **August 1, 20$\overline{46}$**which is called the "Amortization Date") in substantially equal installments at my new interest rate. The result of this calculation will be the new amount of my monthly payment.

Notwithstanding the 40-year amortization period used to calculate my monthly payments, I understand that I must pay all amounts that I owe under this Note in full or on the Maturity Date, which is approximately 30 years from the date of this Note.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    **11.7000**        % or less than  **8.7000**          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   **One**        percentage point(s) (   **1.0000**        %) from the rate of interest I have been paying for the preceding 6      months.

My interest rate will never be greater than        **14.7000**           . %. My interest rate will never be less than **8.7000** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayment without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **10** calendar days after the date it is due; I will pay a late charge to the Note Holder. The amount of the charge will be **10.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Cost and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF THE PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is the guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

40/30 MULTISTATE BALLOON NOTE (ADJUSTABLE RATE) (Assumable)
4030N3MU 4/06                                          Page 3 of 4                                          Initials: _BPC_

**10. WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

    In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of the conditions read as follows:

    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

    To the extend permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

    If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEALS(S) OF THE UNDERSIGNED.

_____ (Seal)
**ELIZABETH P CONRAD**                    -Borrower

_____ (Seal)
                                                           -Borrower

_____ (Seal)
                                                           -Borrower

_____ (Seal)
                                                           -Borrower

*[Sign Original Only]*

40/30 MULTISTATE BALLOON NOTE (ADJUSTABLE RATE) (Assumable)

4030N4MU 4/06                    Page 4 of 4

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:       0        LOAN ID:     10614288

NOTE DATE:      7/21/2006      LOAN AMOUNT:      $460,000.00

BORROWER NAME:  ELIZABETH P CONRAD

PROPERTY ADDRESS:   58 WEED HILL AVENUE, STAMFORD, CT  06907

WITHOUT RECOURSE

PAY TO THE ORDER OF

RESIDENTIAL FUNDING COMPANY, LLC

EMAX FINANCIAL GROUP, LLC

By:

Name: John Hagebock

Title: Vice President

Residential Funding Corporation as Attorney in Fact for;

EMAX FINANCIAL GROUP, LLC

PAY TO THE ORDER OF
U.S. Bank National Association as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

By

Judy Faber, Vice President

Fulcher v. Mazzella, 110703 CTSUP, CV030090452S

**John Fulcher**

**v.**

**John Mazzella**

**CV 03 0090452S**

**Superior Court of Connecticut, Litchfield**

**November 7, 2003**

Caption Date: October 29, 2003

Judge (with first initial, no space for Sullivan, Dorsey, and Walsh): Bryant, J.

Opinion Title: MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION TO STRIKE SPECIAL DEFENSES

The plaintiff moved pursuant to Practice Book §10-39(a) and 10-51 to strike the four special defenses to Count One of the Complaint and the one special defense to Count Two of the Complaint on the basis that those special defenses do not constitute matters which should be specially pleaded. The four special defenses to Count One assert: 1) satisfaction; 2) the plaintiff increased usage of the common drive; 3) to the extent that the plaintiff seeks to recover cost of paving driveway, those costs are not compensable maintenance costs; and 4) failure to mitigate his damages.

The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. Grant v. Bassman, 221 Conn.465, 472-73, 604 A.2d 814 (1992); see also Practice Book §10-50 ("[f]acts which are consistent with [the plaintiffs] statements [of fact] but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged.")

City of Danbury v. Dana Inv. Corporation/Lot No. G08065, 249 Conn. 1, 17, 730 A.2d 1128, 1139-40 (1999). Grant v. Bassman, 221 Conn. 465, 472-73, 604 A.2d 814 (1992). The special defenses pleaded by the defendant assert facts consistent with the allegations of the complaint, but demonstrate nonetheless that the plaintiff is not legally or equitably entitled to the judgment sought and yet the facts pleaded in the special defenses are not placed in issue under our rules by the complaint.

A defendant must specifically plead facts which show that the plaintiff has no cause of action. Practice Book §10-50. Accord and satisfaction and payment must therefore be specifically pleaded. Id. There are two categories of defense which must be pleaded as a special defense: matters of discharge, i.e., based on facts occurring since those alleged in the complaint, and matters of justification or excuses contemporaneous with or prior to facts alleged in the complaint, Stevenson's Connecticut Civil Procedure, Third Edition §83. Practice Book §10-50 does not purport by its terms to exclusively list the matters which must be specifically pleaded; instead it expressly lists illustrations or examples of what may properly be specifically pleaded. Stevenson's supra. §83b. See Jones v. Civil Service Commission, 175 Conn. 504-511, 400 A.2d 721 (1978), Boston Lumber Co. v. Pendelton Brothers, 102 Conn. 626, 633, 121a 782 (1925). A plaintiff must plead facts forming a prima facie claim while the defendant must plead facts which would negate liability even if facts pleaded by the plaintiff are proved. Stevenson's, supra §83c.

In a breach of contract case, failure to mitigate has been recognized as a valid special defense. Profitic, Inc v. FKI Industries 2000, WL 1835 38 (Conn. Super). Satisfaction and payment are both special defenses expressly permitted by §10-50. City of Danbury v. Dana Inv. Corporation/Lot No. G08065, 249 Conn. 1, 17, 30 A.2d 1128, 1139-1140 (1999). The special defenses raised by the defendant are of the type recognized as being properly asserted as special defenses.

For the stated reasons, the motion to strike is denied.

By the Court

Hon. Vanessa L. Bryant

J.P. Morgan Chase Bank v. Gilmore, 102506 CTSUP, FSTCV044001641S

**J.P. Morgan Chase Bank**

**v.**

**Bess P. Gilmore et al.**

**FSTCV 04-4001641 S**

**Superior Court of Connecticut, Stamford**

**October 25, 2006**

Caption Date: October 24, 2006

Judge (with first initial, no space for Sullivan, Dorsey, and Walsh): Jennings, Alfred J., J.:

Opinion Title: MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (No. 148)

This is an action for foreclosure of a first mortgage on premises at 11 Harding Lane, Westport, Connecticut owned by the defendant Bess Gilmore. The plaintiff claims to be the holder of a $375,000 promissory note signed by the defendant Bess Gilmore on February 5, 1999, which note is claimed to be secured by a mortgage executed on the same day by defendant Gilmore and thereafter recorded on the Westport land records. The promissory note is alleged to be in default for nonpayment of installments of principal and interest as provided in the note, and the plaintiff claims to have accelerated the full principal balance of the note together with interest thereon and other sums due under the provisions of the note. In her Revised Answer the defendant denies that the note is in default or that the plaintiff has accelerated the unpaid balance of the note. The defendant has also alleged five special defenses, and a counterclaim against the plaintiff premised on alleged violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a et seq. ("CUTPA"). Now before the court is the plaintiff's Motion for Summary Judgment dated April 14, 2006 by which the plaintiff seeks summary judgment against the defendant Bess Gilmore as to liability only on the complaint, and summary judgment for the plaintiff on the CUTPA counterclaim. The parties have submitted affidavits and memoranda of law supporting and opposing the motion for summary judgment.

*Discussion*

The standards for granting summary judgment are well settled. "Pursuant to Practice Book §17-49, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Mytych v. May Dept Stores Co.*, 260 Conn. 152, 158-59 (2002). In deciding whether or not there is no genuine issue of material fact, the evidence is reviewed in the light most favorable to the nonmoving party. *B&D Associates, Inc. v. Russell,* 73 Conn.App. 66, 69 (2002); *Yancey v. Connecticut Life & Casualty Ins. Co.,* 68 Conn.App. 556, 558 (2002)." *Faigel v. Fairfield University,* 75 Conn.App. 37, 39-40 (2003). "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Golden v. Johnson*

*Memorial Hospital, Inc.,* 66 Conn. App. 518, 522-23, cert.denied, 259 Conn. 902, 789 A.2d 990 (2001). A material fact is a fact that will make a difference in the result of the case. *Buell Industries, Inc. v. Greater New York Mutual Insurance Company,* 259 Conn. 357 556 (2002). In ruling on a motion for summary judgment, it is customary for the court to review documentary proof submitted by the parties to demonstrate the existence or nonexistence of issues of material fact. Practice Book §17-45." *Drew v. William W. Backus Hospital,* 77 Conn.App. 645, 650 (2003). *Defendant Bess Gilmore's Liability on the Complaint.*

 The plaintiff has alleged in ¶5 of its complaint, and the defendant has denied in her answer that the note signed by the defendant Bess Gilmore is in default and that the plaintiff as the owner and holder of the note and mortgage has elected to accelerate the balance due on the note. The allegation of default under the note is an essential allegation of plaintiff's complaint which must be proved by a preponderance of the evidence in order for the plaintiff lender to prevail and to become entitled to a foreclosure of the mortgage. "[A] foreclosure complaint must contain certain allegations regarding the nature of the interest being foreclosed. These should include allegations relating to the parties and terms of the operative instruments, *the nature of the default giving rise to the right to foreclosure,* the amount currently due and owing, the name of the record owner and of the party in possession, and appropriate prayers for relief." (Emphasis added.) N*ew England Savings Bank v. Bedford Realty Corp*., 246 Conn. 594, 610 (1998) quoting from D. Canon, Connecticut Foreclosures: An Attorney's Manual of Practice and Procedure (3d Ed. 1997) §4.09. P. 106. On this crucial issue, the April 6, 2006 affidavit of Melanie Colton, Senior Vice President of Saxon Mortgage Services, Inc. plaintiff's servicing agent, says:

8. The defendant has failed to make monthly mortgage payments as required by the loan documents since the payment due for May 1, 2004 and each and every month thereafter.

9. The Defendant is in default under the loan documents for failure to make payments as required by the terms of the Note and Mortgage.

10. The Defendant was duly notified in writing by the Plaintiff in accordance with the terms of the Note and Mortgage of the default and that the failure to cure the default may result in acceleration of the debt. The Defendant has failed and neglected to cure the default. A true and accurate copy of the default letter is attached hereto as Exhibit E.

11. Thereafter the Note was accelerated and the remaining unpaid principal balance, plus interest, attorneys fees and costs are due and owing to the Plaintiff.

 Exhibit "E" to the Colton affidavit is a copy of a letter of July 6, 2004 from Saxon Mortgage Services, Inc. To the defendant Bess P. Gilmore, advising her that the note was $11,156.70 in default and giving her a period of 30 days from July 6, 2004 to cure.

 As to the same issue, the defendant Bess P. Gilmore, in her affidavit of May 15, 2006, says:

12. Regardless, as of December 8, 2003 [the date that a previous foreclosure case between the parties was withdrawn] I considered any dispute to be resolved and I continued to make regular payments in accordance with the loan documents.

13. Then, on February 10, 2004, for reasons unbeknownst to me, I was again placed in default and was told I owed $11,150.96. A true and correct copy of this Notice of default is attached

hereto as Exhibit E.

14. I am unaware as to how the Plaintiff calculated such an inaccurate and excessive amount, and the plaintiff never gave me an explanation or itemization of these amounts. To this very date, they have never provided an explanation.

15. Upon contacting the Plaintiff by both telephone and mail, its representative could not determine how the $11,150.96 figure was calculated, and could not identify any reason whatsoever for such a charge . . . I repeatedly reminded them that the loan had already been reinstated and paid current . . .

16. I am unaware as to how, after resolving the prior dispute with the Plaintiff as of December 8, 2003, and after several months of making the proper payments pursuant to the terms of the loan documents, I can be placed in default again, receive a bill for $11,150.96, and not receive any response from the plaintiff as to how such an amount was calculated.

17. I received additional Notices of default on March 12, 2004 and July 7, 2004 indicating that the past due amount was $11,158.91 and $11,163.70, respectfully [sic.] . . .

18. I continued to make tender of proper payments to the Note and Mortgage, but the Plaintiff continued to reject my payments, demanding payments of even larger amounts than those demanded in the February 10, 2004, March 12, 2004, and July 7, 2004 Notices of Default. a) on July 28, 2006 [sic.], after the return of my June mortgage payments which was the alleged cause of this case, the Plaintiff's employee Mr. Ali called from Saxon and said I owed over $600 in fees in addition to my June and July mortgage payments . . .

       Exhibit "H" to the defendant's Objection to Plaintiff's Motion for Summary Judgment is a copy of a July 7, 2004 letter from Saxon Mortgage Services, Inc. to Bess P. Gilmore, which reads, in part, "You have defaulted on your obligation to pay your monthly mortgage payments as scheduled. The enclosed payment has been rejected due to the status of your loan. Your immediate attention is required. You may remedy this situation by remitting the total amount due, as shown above [$11,163.70] before your next due date . . ." The enclosure to that letter is check no. 14631 on the checking account of Community Club Awards, Inc., dated June 28, 2004 and signed by Bess Gilmore, drawn to the order of "Saxon Mortgage" in the amount of $4,805.82 with a reference to "Loan #0011068298" (which is the same loan number referenced in the letter).

       The court finds that the plaintiff has failed to meet its initial burden of demonstrating the nonexistance of a material issue of fact. From the foregoing recitations from the supporting and opposing affidavits and exhibits it is clear that there are genuine issues of fact as to the essential element in this or any other foreclosure case as to the " . . . nature of the default giving rise to the right to foreclosure . . ." *New England Savings Bank v. Bedford Realty Corp.*, *supra*. The plaintiff states in the Colton affidavit that the default on which this case is based is the defendant's failure to make monthly mortgage payments as required by the loan documents since the payment due for May 1, 2004 and each and every month thereafter. The defendant states in her affidavit that, after the loan was reinstated and brought current as of December 8, 2003, she "continued to make regular payments in accordance with the loan documents" which payments at some point began to be rejected and returned by the plaintiff. She also states that she began receiving unexplained default notices in February and March 2004 (several months before the May 1, 2004 loan payment

was even due.) The plaintiff's Colton affidavit totally fails to address those earlier 2004 notices of default. Although the plaintiff purports to base its claim of default on the defendant's failure to make the May 2004 and subsequent note payments, the $11,167.70 default claimed as of July 6, 2004 (Ex. "H," *supra*) does not equate to that position, since the earlier default notices in February and March 2004, per the defendant's affidavit, recite approximately the same monetary amount of default. If the defendant had defaulted on the May 2004 loan payment, it would seem that the amount claimed to be in default would have increased accordingly between February and July. There are issues and inconsistencies presented by the affidavits and documentation as to when the default occurred and the nature of the payment or other obligation that was not timely performed. Summary judgment should be granted when the moving party would be entitled to a directed verdict on the same facts. *Batick v. Seymour,* 186 Conn. 632, 647 (1982). The court would not direct a verdict for the plaintiff on the issue of liability on these facts.

These factual issues go to an essential element of the prima facie case that a foreclosure plaintiff must plead and prove. "In a mortgage foreclosure action [t]o make out its prima facie case, [the foreclosing party] has to prove by a preponderance of the evidence that it [is] the owner of the note and mortgage and that [the mortgagor] ha[s] defaulted on the note." (Internal quotation marks omitted.) *Franklin Credit Management Corp. v. Nicholas,* 73 Conn.App. 830, 838 (2002), cert. denied 262 Conn. 937 (2003). Summary judgment as to liability on the allegations of the complaint is therefore not appropriate as there are triable issues of fact.

*Plaintiff's Liability on the Counterclaim*

The plaintiff has also moved for summary judgment on the counterclaim. The defendant in her Substitute Answer Special Defenses and Counterclaim of February 7, 2006 has pleaded CUTPA counterclaim by incorporating allegations from her second and third special defenses (both claiming breach of a loan agreement and breach of the note and deed by the plaintiff) and from her fourth special defense (claiming breach of the covenant of good faith and fair dealing). From those allegations the defendant concludes that "The Plaintiff's actions as aforesaid constitute illegal, deceptive, and unscrupulous actions prohibited by the Connecticut Unfair Trade Practices Act (CUTPA) . . ." and that "As a result of the Plaintiff's actions as aforesaid, the Defendant has sustained substantial damages, including fees and expenses for which the Plaintiff is liable, plus punitive damages." The factual allegations incorporated from the special defenses are that the plaintiff improperly rejected and returned defendant's payments, illegally attempted to charge excessive fees and interest and illegally attempted to declare the defendant in default on ten separate occasions between January 24, 2001 and July 7, 2004; that the plaintiff acknowledged its improper, illegal actions as evidenced by the fact that it previously commenced a foreclosure action against the defendant in 2003 and then withdrew the case shortly after filing it; that after the plaintiff rejected the defendant's lawful payment in July 2004, the plaintiff demanded without explanation payments of larger amounts than was demanded in its rejection letter of July 7, 2004; that the plaintiff thereafter demanded an amount $2,000 less than the amount demanded in the rejection letter of July 7, 2004 and thereafter demanded yet another amount of money which included illegal fees and charges; and that the plaintiff thereafter demanded yet another $2,000 in order to arrange a payment plan despite the absence of any such provision in the note or

mortgage.

In moving for summary judgment on the counterclaim the plaintiff does not contest the nonconclusory allegations of the counterclaim or claim that there is no material issue of fact as to those allegations. The plaintiff, instead, argues that the counterclaim as pleaded is legally insufficient essentially for two reasons: (1) that it goes to matters beyond the making, validity, and enforcement of the note and mortgage and therefore does not arise out of the same transaction as the plaintiff's complaint; and (2) that it fails to satisfy the three criteria for a CUPTA violation. These very same arguments were raised by plaintiff's motion to strike dated January 6, 2006. (No. 137.) That motion was directed to thee defendant's five special defenses and to the counterclaim. The court (David Tobin, J.) Granted the motion to strike as to the second, third, and fourth special defenses and denied it as to the first and fifth special defenses, but failed to rule on the portion of the motion to strike directed to the counterclaim. Rather than seeking an articulation of that ruling to include a ruling on the counterclaim, and after having answered and pleaded special defenses to the counterclaim as set forth in defendant's re-pleaded answer, the plaintiff now advances the very same arguments of insufficiency of the counterclaim as part of its motion for summary judgment. In fact the defendant has submitted a memorandum of law on this point which is virtually a reprint of the memorandum of law submitted to Judge Tobin with respect to the motion to strike.

Our Supreme Court recently addressed the question of whether a motion for summary judgment may be used instead of a motion to strike to challenge the legal sufficiency of a complaint, and if, so, under what circumstances, in *Larobina v. McDonald,* 274 Conn. 394 (2005). The court recognized the potential unfairness of using a motion for summary judgment for that purpose because the granting of a summary judgment puts the plaintiff out of court while the granting of a motion to strike allows the plaintiff to replead his or her case. Recognizing that unfairness, the court held nonetheless that a motion for summary judgment is not improper if it is clear on the face of the complaint that it is legally insufficient and that an opportunity to amend it would not help the plaintiff. 274 Conn. at 401. Under this criteria, the plaintiff's first argument (counterclaim not part of same transaction) will be considered on its merits, as a repleading would not likely alter the result. The second argument (allegations of the counterclaim fail to satisfy the thee criteria of a CUTPA violation), is obviously the type of issue that could be repleaded. The court finds that it would be unfair to consider that argument in the present procedural context and possibly deprive the defendant of the right to plead over, especially given the history of the case where the counterclaim has previously withstood a motion to strike. Only the first argument, then, will be addressed herein.

Practice Book §10-10 allows a defendant to file a counterclaim against any plaintiff ". . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint." Under that test, CUTPA counterclaims to foreclosure complaints have been disallowed because they do not relate to the making, validity or enforcement of the note and mortgage, and therefore do not arise out of the same transaction as the complaint. See, e.g. *Ocwen Federal Bank, FSB v. Stawski,* Superior Court, Judicial District of New London at New London, Docket No. 552683 (April 26, 2000, Martin, J.), 2000 Conn.Super

LEXIS 1025. Other decisions have allowed CUTPA counterclaims to foreclosure actions, or have at least considered them on their merits without being stricken under Practice Book §10-10. See, *Lord Corp. v. Widewaters New Castle,* Superior Court, Judicial District of Ansonia-Milford at Milford, Docket No. CV03-0083912 (July 1, 2005, Moran, J.), 2005 WL 1762065, citing *Cheshire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 105-15 (1992); *Mortgage Electronic Registration Systems, Inc. v. Perfido,* Superior Court, Judicial District of Stamford/Norwalk at Stamford, Docket No. CV03-0193829 (September 17, 2003, D'Andrea, JTR), 2003 Ct.Sup. 10879-cz ("A violation of CUTPA has been recognized as a valid counterclaim brought in a foreclosure action"); and *American Business Credit, Inc. v. D&L Auto Body & Towing, Inc*., Superior Court, Judicial District of New Britain at New Britain, Docket No. CV01-05076655 (November 14, 2002, Berger, J.), 200 Ct.Sup. 14556 ("The remaining allegations of the [CUTPA] counterclaim relate to the defendants' inducement to make the note and mortgage are therefore sufficiently related to the foreclosure action to withstand a motion to strike").

The court finds in this case that the CUTPA counterclaim, as pleaded, has sufficient connection with the foreclosure complaint that it survives the "same transaction" test and should not be stricken. As previously indicated the issues between the parties as to the complaint (which are largely the same issues pleaded in the counterclaim) go to an essential element of plaintiff's prima facie case: did the defendant default, and what was the nature of that default? It is also noted that the counterclaim does plead that the plaintiff has breached the provisions of the note and mortgage which documents are the very heart of the complaint.

*Order*

For the foregoing reasons the plaintiff's motion for summary judgment as to liability of the defendant on the allegations of the complaint is denied; and the plaintiff's motion for summary judgment on the counterclaim is also denied.

So Ordered.

Alfred J. Jennings, Jr., Judge

Westlaw.

C.G.S.A. § 42a-3-203

**C**
Connecticut General Statutes Annotated Currentness
   Title 42A. Uniform Commercial Code (Refs & Annos)
       Article 3. Negotiable Instruments (Refs & Annos)
           Part 2. Negotiation, Transfer and Endorsement (Refs & Annos)
               →§ 42a-3-203. Transfer of an instrument. Rights acquired by transfer

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of endorsement by the transferor, the transferee has a specifically enforceable right to the unqualified endorsement of the transferor, but negotiation of the instrument does not occur until the endorsement is made.

(d) If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this article and has only the rights of a partial assignee.

CREDIT(S)

(1959, P.A. 133, § 3-203; 1991, P.A. 91-304, § 22.)

UNIFORM COMMERCIAL CODE COMMENT

        <For UCC acknowledgments, see CT ST UCC Acknowledgments.>

2002 Main Volume

1. Section 3-203 is based on former Section 3-201 which stated that a transferee received such rights as the transferor had. The former section was confusing because some rights of the transferor are not vested in the transferee unless the transfer is a negotiation. For example, a transferee that did not become the holder could not negotiate the instrument, a right that the transferor had. Former Section 3-201 did not define "transfer." Subsection (a) defines transfer by limiting it to cases in which possession of the instrument is delivered for the purpose of giving to the person receiving delivery the right to enforce the instrument.

Although transfer of an instrument might mean in a particular case that title to the instrument passes to the transferee, that result does not follow in all cases. The right to enforce an instrument and ownership of the instrument are two different concepts. A thief who steals a check payable to bearer becomes the holder of the check and a person entitled to enforce it, but does not become the owner of the check. If the thief transfers the check to a purchaser the transferee obtains the right to enforce the check. If the purchaser is not a holder in due

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

C.G.S.A. § 42a-3-203

course, the owner's claim to the check may be asserted against the purchaser. Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3, which do not depend upon whether the instrument was transferred under Section 3-203. Moreover, a person who has an ownership right in an instrument might not be a person entitled to enforce the instrument. For example, suppose X is the owner and holder of an instrument payable to X. X sells the instrument to Y but is unable to deliver immediate possession to Y. Instead, X signs a document conveying all of X's right, title, and interest in the instrument to Y. Although the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains possession of the instrument. No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y.

An instrument is a reified right to payment. The right is represented by the instrument itself. The right to payment is transferred by delivery of possession of the instrument "by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." The quoted phrase excludes issue of an instrument, defined in Section 3-105, and cases in which a delivery of possession is for some purpose other than transfer of the right to enforce. For example, if a check is presented for payment by delivering the check to the drawee, no transfer of the check to the drawee occurs because there is no intent to give the drawee the right to enforce the check.

2. Subsection (b) states that transfer vests in the transferee any right of the transferor to enforce the instrument "including any right as a holder in due course." If the transferee is not a holder because the transferor did not indorse, the transferee is nevertheless a person entitled to enforce the instrument under Section 3-301 if the transferor was a holder at the time of transfer. Although the transferee is not a holder, under subsection (b) the transferee obtained the rights of the transferor as holder. Because the transferee's rights are derivative of the transferor's rights, those rights must be proved. Because the transferee is not a holder, there is no presumption under Section 3-308 that the transferee, by producing the instrument, is entitled to payment. The instrument, by its terms, is not payable to the transferee and the transferee must account for possession of the unindorsed instrument by proving the transaction through which the transferee acquired it. Proof of a transfer to the transferee by a holder is proof that the transferee has acquired the rights of a holder. At that point the transferee is entitled to the presumption under Section 3-308.

Under subsection (b) a holder in due course that transfers an instrument transfers those rights as a holder in due course to the purchaser. The policy is to assure the holder in due course a free market for the instrument. There is one exception to this rule stated in the concluding clause of subsection (b). A person who is party to fraud or illegality affecting the instrument is not permitted to wash the instrument clean by passing it into the hands of a holder in due course and then repurchasing it.

3. Subsection (c) applies only to a transfer for value. It applies only if the instrument is payable to order or specially indorsed to the transferor. The transferee acquires, in the absence of a contrary agreement, the specifically enforceable right to the indorsement of the transferor. Unless otherwise agreed, it is a right to the general indorsement of the transferor with full liability as indorser, rather than to an indorsement without recourse. The question may arise if the transferee has paid in advance and the indorsement is omitted fraudulently or through oversight. A transferor who is willing to indorse only without recourse or unwilling to indorse at all should make those intentions clear before transfer. The agreement of the transferee to take less than an unqualified indorsement need not be an express one, and the understanding may be implied from conduct, from past practice, or from the circumstances of the transaction. Subsection (c) provides that there is no negotiation of the instrument until the indorsement by the transferor is made. Until that time the transferee does not become a holder, and if earlier notice of a defense or claim is received, the transferee does not qualify as a holder in due course under Section 3-302.

4. The operation of Section 3-203 is illustrated by the following cases. In each case Payee, by fraud, induced Maker to issue a note to Payee. The fraud is a defense to the obligation of Maker to pay the note under Section 3-305(a)(2).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

C.G.S.A. § 42a-3-203

*Case #1*. Payee negotiated the note to X who took as a holder in due course. After the instrument became overdue X negotiated the note to Y who had notice of the fraud. Y succeeds to X's rights as a holder in due course and takes free of Maker's defense of fraud.

*Case #2*. Payee negotiated the note to X who took as a holder in due course. Payee then repurchased the note from X. Payee does not succeed to X's rights as a holder in due course and is subject to Maker's defense of fraud.

*Case #3*. Payee negotiated the note to X who took as a holder in due course. X sold the note to Purchaser who received possession. The note, however, was indorsed to X and X failed to indorse it. Purchaser is a person entitled to enforce the instrument under Section 3-301 and succeeds to the rights of X as holder in due course. Purchaser is not a holder, however, and under Section 3- 308 Purchaser will have to prove the transaction with X under which the rights of X as holder in due course were acquired.

*Case #4*. Payee sold the note to Purchaser who took for value, in good faith and without notice of the defense of Maker. Purchaser received possession of the note but Payee neglected to indorse it. Purchaser became a person entitled to enforce the instrument but did not become the holder because of the missing indorsement. If Purchaser received notice of the defense of Maker before obtaining the indorsement of Payee, Purchaser cannot become a holder in due course because at the time notice was received the note had not been negotiated to Purchaser. If indorsement by Payee was made after Purchaser received notice, Purchaser had notice of the defense when it became the holder.

5. Subsection (d) restates former Section 3-202(3). The cause of action on an instrument cannot be split. Any indorsement which purports to convey to any party less than the entire amount of the instrument is not effective for negotiation. This is true of either "Pay A one-half," or "Pay A two-thirds and B one-third." Neither A nor B becomes a holder. On the other hand an indorsement reading merely "Pay A and B" is effective, since it transfers the entire cause of action to A and B as tenants in common. An indorsement purporting to convey less than the entire instrument does, however, operate as a partial assignment of the cause of action. Subsection (d) makes no attempt to state the legal effect of such an assignment, which is left to other law. A partial assignee of an instrument has rights only to the extent the applicable law gives rights, either at law or in equity, to a partial assignee.

HISTORICAL AND STATUTORY NOTES

2002 Main Volume

**Codification**

Gen.St., Rev. to 1993, changed the section heading from "Wrong or misspelled name" to "Transfer of an instrument. Rights acquired by transfer".

**Amendments**

**1991 Amendment.** 1991, P.A. 91-304, § 22, revised section, which had read:

"Where an instrument is made payable to a person under a misspelled name or one other than his own he may endorse in that name or his own or both; but signature in both names may be required by a person paying or giving value for the instrument."

**Prior Laws:**
    1902 Rev., §§ 4197, 4219 to 4202, 4228.
    1918 Rev., §§ 4385, 4388 to 4390, 4407, 4416.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

C.G.S.A. § 42a-3-203

 1930 Rev., §§ 4344, 4347 to 4349, 4366, 4375.
 1949 Rev., §§ 6319, 6322 to 6324, 6341, 6350.
 1958 Rev., §§ 39-28, 39-31 to 39-33, 39-50, 39-59.

**Uniform Laws:**

This section is similar to § 3-203 of the Uniform Commercial Code, 1990 Revision of Article 3. See Uniform Laws Annotated, Master Edition or the ULA database on Westlaw.

LAW REVIEW AND JOURNAL COMMENTARIES

Erosion of holder in due course doctrine. Leona M. Hudak and Robert Carter 9 UCC L.J. 165 (1976).

LIBRARY REFERENCES

2002 Main Volume

 Bills and Notes ☜223 to 384.
 Westlaw Topic No. 56.
 C.J.S. Bills and Notes; Letters of Credit §§ 4, 24 to 25, 28 to 30, 33, 63, 65, 139, 142 to 147, 149 to 157, 159 to 201, 203 to 204, 242 to 248, 291.

RESEARCH REFERENCES

2007 Electronic Pocket Part Update

Treatises and Practice Aids

2 Connecticut Practice Series Form 305.26, Against a Holder in Due Course.

NOTES OF DECISIONS

 **Holder in due course 1**

 1. Holder in due course

Uniform Commercial Code (UCC) did not entitle pub, as holder in due course of paychecks pub had cashed for subcontractor's employees, to make claim against payment bond issued by surety in connection with public works project; pub's status as holder in due course simply meant that it held checks free from certain claims and defenses of drawer of check, but did not give pub any affirmative rights concerning payment bond. Dysart Corp. v. Seaboard Sur. Co. (1997) 688 A.2d 306, 240 Conn. 10. Bills And Notes ☜363; Public Contracts ☜47.1

C. G. S. A. § 42a-3-203, CT ST § 42a-3-203

Current through the 2007 Jan. Reg. Sess. and public acts from the
June Sp. Sess. approved by the Gov. on or before October 5, 2007.

Copr © 2007 Thomson/West

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

C.G.S.A. § 42a-3-203

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.